## HAKE *v.* COACH.[1]

1. PARTNERSHIP—ACCOUNTING.

   Upon a review of the evidence, *held*, that the purchase of certain lands by defendant was not intended to be made for the benefit of the copartnership existing between himself and complainant, and that the latter had failed to establish his claim that the profits of previous transactions of the firm had been dissipated or concealed by defendant.

2. SAME—INDIVIDUAL PURCHASE—SCOPE OF FIRM BUSINESS—CONFUSION OF FUNDS.

   Complainant and defendant were jointly interested in certain lumbering operations, the business being conducted in the name of defendant. While so engaged, defendant purchased certain lands in his individual capacity, and lumbered them under contract with third parties. Complainant, contending that the proceeds of the venture belonged to the partnership, filed a bill for an accounting, upon which it appeared that, prior to the transaction in controversy, the partnership dealings had been confined to lands already owned by the parties, or to specific tracts purchased from time to time by mutual agreement; that the purchase in question was made openly and without concealment; that, while the firm bank account

[1] Rehearing denied March 3, 1896.

was kept in defendant's name, and checks were drawn against it in payment for the lands, the account was at such times indebted to defendant for advances; and that the payments made were in fact realized from the lands themselves, in connection with defendant's individual credit. *Held*, that the purchase of the lands was not within the scope of the partnership business; that defendant, therefore, had the right to make the same for his sole benefit; and that there had been no such confusion of funds as to entitle complainant to share in the profits of the transaction.

Appeal from Kent; Grove, J. Submitted October 12, 1895. Decided December 3, 1895.

Bill by William Hake against William Coach for an accounting. From a decree declaring certain dealings to have been partnership transactions, defendant appeals. Reversed.

*Daniel E. Corbitt*, for complainant.

*Chadbourne & Rees*, for defendant.

McGrath, C. J. This is a bill for an accounting as to certain partnership dealings in lumbering certain pine lands in the Upper Peninsula. Defendant appeals from a decree declaring that certain purchases and sales of timber, claimed by him to have been his individual transactions, were partnership dealings, and that defendant must account for the proceeds thereof. The testimony was principally taken out of court.

. It appears that, in 1885, the parties were jointly interested in lands in Louisiana, and in certain pine lands in this State, which are denominated as the "Sturgeon River Lands." Complainant, who was in business at Grand Rapids, had about $3,750 in his hands belonging to defendant, who had been operating at New Orleans. It was agreed that defendant should go to the Upper Peninsula and lumber the Sturgeon River lands, that complainant should advance the necessary funds for that purpose, and that the parties should share equally in the profits. This

work was completed in the summer of 1888. Both parties at that time supposed that large profits had been realized upon those operations, but the assets consisted of accounts receivable, logs, and camp equipage. At that time the amount of complainant's advances was ascertained, and defendant, to equalize the capital invested, made a transfer to complainant of certain of the Louisiana lands, which made the amount invested by each of the parties between $8,000 and $9,000, including in defendant's investment the amount due him at the outset from complainant. In the fall of 1888, defendant suggested the purchase of certain L'Anse lands, complainant assented, and the operations thereon continued until some time in 1890 or 1891.

In the spring of 1889, defendant obtained an option on certain Otter Creek lands. He invited complainant to join in the purchase. Complainant at first declined, and defendant sought the co-operation of others. The deal was a large one, the purchase price being $52,000. Defendant made more favorable terms with the owner, and complainant finally consented to the purchase on joint account. A note for $5,000 was drawn up, signed by one of the parties, and indorsed by the other, discounted at one of the Grand Rapids banks, and the proceeds used to make the first payment on the Otter Creek land purchase. Other small purchases of lands and timber had been made prior to this last purchase. Defendant was still engaged in lumbering these lands when this suit was commenced.

It is conceded that all the purchases and operations, up to and including the Otter Creek land purchase, and the lumbering thereof, were partnership dealings. Complainant's bill sets forth these purchases, operations, and sales, and further avers that—

"Your orator has been informed, and believes the same to be true, that the said defendant has been engaged in lumbering on other lands, to wit, a piece of land that is

known as 'Section 31,' and on which he claims that large profits were made, sometimes naming them as high as five or six thousand dollars, which he says was an individual enterprise of his own, and that your orator had no interest in it; while your orator is informed and believes, and so charges the truth to be, that whatever money and time that was expended on section 31 was taken out of the firm of Coach & Hake, and whatever profits were made in lumbering on that section rightfully belong to the said firm. And your orator is also informed and believes, and so charges the truth to be, that the said defendant has purchased lands and timber in different places in the State of Michigan, and also in the State of Wisconsin (as to what particular places he is not informed), but that any money that has been paid for said lands and timber has been taken out of the money belonging to the said firm of Coach & Hake."

Section 31 was purchased in May, 1889, evidently within a very short time after the purchase of the Otter Creek lands hereinbefore referred to. Three other purchases were made by defendant,—one in August, 1891, and the other two in August and October, 1892. None of these lands were operated by defendant, but they were lumbered by others on shares, or resales were made of the timber. The trial court found that all of these were partnership, and not individual, transactions.

This bill was filed in 1893. Complainant's contention is that, in 1888, the assets of the firm were large; that defendant represented that the firm had made large profits from operating the L'Anse lands; that defendant has dissipated or concealed those profits, and that, since the Otter Creek purchase, complainant has frequently demanded a statement of the affairs of the copartnership, but defendant has failed to furnish it; that the entire business was conducted, the contracts for the purchase of land made, the notes given, the bank accounts kept, the checks given, and the bills made out in the name of William Coach; that these other transactions were originally intended as partnership, and not as individual, matters; and that, in any event, the purchases were made

with the partnership credit and firm funds, and that com-
plainant is entitled to participate in the profits thereof.

The facts are controverted; but, whatever the result of
the operations prior to the Otter Creek land purchase,
it is clear that there was no dispute at that time regard-
ing the financial condition of the firm, and that partner-
ship funds were not available for that purchase. No
complaint had been made at that time. It is further evi-
dent that the Otter Creek land purchase involved, not
only a large indebtedness, but a very large outlay in the
lumbering of those lands, and that the lack of snow and
water, and other circumstances, interfered very mate-
rially with the lumbering operations upon that tract, and,
in consequence, not only were the logs tied up for two
seasons, but extra expense was incurred, and the prop-
erty depreciated in value. It also appears, from the cor-
respondence, that there were serious drawbacks in con-
nection with the operations on the L'Anse lands. It is
further evident that, from the commencement of the
operations in 1885, one of complainant's sons was with
defendant; that, up to the time of the L'Anse purchase,
defendant sent all bills, time checks, contracts, and other
papers to the complainant, and that whatever books were
kept on behalf of the firm were kept by Charles W. Hake,
a son of the complainant, at Grand Rapids; that, after
the purchase of the L'Anse lands, and up to the time of
filing this bill, complainant's son, Henry Hake, acted as
defendant's bookkeeper at the base of operations, and
that the accounts were kept by him.

On September 15, 1891, after the purchase of section
31 and one of the other purchases, the following agree-
ment was made:

"*Whereas,* William Coach and William Hake have been
in partnership, logging and lumbering in the Upper
Peninsula, along Otter creek, in the State of Michigan,
and they want to bring their business to a close, and
William Hake can give no time to the business: Now, it
is agreed that Henry Hake may act in the place of Wil-

liam Hake, and his acts shall be as binding on the partners as if the same acts were done by William Hake. Henry Hake shall keep the books of the partnership, and shall keep a cash account of the business, of all receipts and disbursements, so that they can be inspected at any time. The services of Henry Hake shall be paid by William Hake, and they shall offset against the services of William Coach from this date. When the debts of the partnership are paid, all property remaining shall be divided between William Coach and William Hake. All business hereafter done by the said partnership shall be done in the name of Coach & Hake. The following is a list of the assets and liabilities of the partnership."

The fact of the purchase of section 31 was known to complainant at that time, but no mention is made of these lands or operations upon them in this instrument.

Although the purchases hitherto made had been made after consultation with complainant, although in the spring of 1889 complainant had first declined to join in the purchase of the Otter Creek lands, and although the fact of this purchase was known at the time thereof, it nowhere appears that complainant was consulted with reference to this purchase, or that any word of criticism, approval, or disapproval was uttered respecting such purchase by complainant or either of his sons, one of whom was on the ground; and although defendant made a contract with certain parties to lumber these lands and divide the profits, and it was known that the lands were being lumbered, yet the nature of that contract or its terms was not referred to, or any inquiry made as to its details or the operations under it.

On August 27, 1889, defendant wrote complainant a letter, in which he says:

"Wish you would send by express the balance of first note. * * * I want to take up the last note I gave to the Ayers estate. It is for $11,630. * * * We get the right to cut that much timber, and will have to take up the other note later on. * * * If you can see Mrs. Burns, and get her to lend us $12,000 at 7 per cent., it will be very acceptable. Write me what you can do. If you

succeed, make it into a New York draft, enough to cover the note. Don't let this disturb your slumbers. We are all right, only going in a little steep. * * * I will indorse with you on Mrs. Burns' note if she wishes, making the note good in any bank. Of course, we will be borrowers this winter, as we swing a heavy load."

Charles W. Hake testifies that defendant told him of the purchase; that defendant stated, in substance, that he and one Towar, the cashier of the Hancock Bank, had purchased section 31; that Towar had put in the money, and that he and Towar were to divide the profits; that, from three to six months afterwards, defendant stated to him that the officers of the bank had objected to outside speculations, hence he (defendant) had been obliged to relieve Towar, and that he had taken up the note, which had been given for the first payment, with the firm moneys, and held the land on joint account. Defendant denies that he had either of these conversations with young Hake, but states that he went to Towar, and asked him to join in the speculation, but that Towar declined, and suggested a third party, but that this party, who resided at Hancock, also declined, and that he went back to Towar, who advanced him the amount of the first payment, taking an assignment of the contract as security. Towar is called, and corroborates the defendant. He is asked the question: "Is it true that you went in with Coach on the purchase of that land, and withdrew afterwards because the bank directors objected to your speculating?" His answer was: "No, sir. There is not a word of truth in it. There is nothing to found such a statement upon. It has not the semblance of truth." It also clearly appears that, at the time of the purchase of section 31, and all along down to the time of filing this bill, the firm was short of funds to meet operating expenses and liabilities. At the very time of the purchase there was $2,000 in bank, but defendant did not make use of it.

It is true that the operations were carried on in the

name of the defendant, but this was done from 1885 down with complainant's knowledge, and without his disapproval. The bills, time checks, contracts, etc., relating to the business were sent to complainant's son at Grand Rapids until 1889. After that time complainant's son Henry was on the ground acting as bookkeeper. He knew that all accounts, including the bank accounts, were in the name of defendant.

While it is true that the bank account was in defendant's name, that account discloses the source of all deposits, and the fact appears that all the payments made upon section 31, and the subsequent purchases now claimed as firm matters, were realized from the lands themselves, in connection with defendant's individual credit, and that, whenever defendant checked upon bank deposits to make these payments, the account drawn upon was indebted to him for advances, which were usually made in anticipation of these payments. The bank books corroborate defendant's testimony on this issue. There seems to be no difficulty in tracing partnership receipts, and distinguishing the same from individual moneys, upon the very face of the bank accounts. It does appear that some of the proceeds of these operations went into these bank deposits, and that they were used by defendant to meet firm liabilities, and of this fact the bookkeeper was from time to time advised by defendant. It cannot be said that, because the defendant made these advances, or because he made deposits of individual moneys in the same account with the firm moneys, the moneys so deposited became firm moneys.

It is a well-settled rule that a partner cannot derive exclusive profit from the use of partnership funds; but it affirmatively appears that no such thing was here attempted. Defendant has traced every dollar of the money used in the purchase of these lands. The scope of the partnership operations was limited. These transactions were not concealed. They were entered into

when, by the correspondence, and by the conduct of the parties, covering a period of four years, at least, it appears that the firm assets were tied up, and the firm was a borrower. The theory of the complainant seems to be that the firm ought not to have been a borrower, and that, in some manner, the proceeds of previous transactions were concealed or dissipated; but no complaint seems to have been made upon that hypothesis until this bill was filed, and in the meantime thousands of dollars were borrowed for firm purposes, to the knowledge and with the co-operation of complainant, and the first payment on the last purchase made on firm account was made by discounting a note made by one of the parties and indorsed by the other.

It is suggested that statements were asked for from time to time, which were not given. Evidently the very drawbacks that attended the operations on both the L'Anse lands and the Otter Creek lands occasioned some apprehension in the mind of complainant. The correspondence, continuing until some time in 1893, seems to have been of a friendly nature, and discloses the condition of complainant's mind. It will be remembered that Henry Hake, complainant's son, was keeping the firm books. Defendant writes, June 8, 1890, referring to business matters, and says:

"Our drive cost us seven thousand extra on account of cold, but we are still on deck. * * * Henry will bring his books down in a day or two, and then he will make you a visit. * * * If I can spare the time, I will come down with Henry for a couple of days."

October 16, 1890, he writes:

"Would like those notes extended for 90 days, with privilege of paying sooner."

January 12, 1890, he writes to Charles Hake that he had made certain payments, and says:

"Hope your father feels better all around."

February 3, 1893, he writes:

"Henry Hake certainly has not informed you about our accounts, else you would know that it took all the notes to pay indebtedness in G. R. bank and up here, and besides had to go to Burtis and beg him for $5,000 on nine months' note, for which he now holds lien on the logs. Got a balance of $2,500 in bank, but also judgment in court, lawyers' fees, and other expenses to put balance of logs into lumber, and drive, sorting, towing, and sawing. But am willing to turn the business over to you at any time, and as soon as I come back from Louisiana you or your boys can come up, and I will transfer it all to you. Of course, you will have to assume the expense of the suit.  *  *  *  I can raise on the logs at mill enough to cover your account, if you wish.  *  *  *  Will try to do all I can for you, if you need the money."

The letter then refers to a contemplated trip to Louisiana to look after their joint interests there, and says:

"I will look over all the lands and see the position they may be in. I can sell one-fourth interest, I think, to parties up here. I wanted you to go with me, as it would be some satisfaction to you to see for yourself if the risk in holding was great, but will report to you my opinion on same as soon as I get through."

On February 25, 1893, on his return from Louisiana, he reports, and says, with reference to local matters:

"I have written Mr. Sawyer for $5,000 advance on next season lumber, and think I will get same. I could then square up with you. You had better come up when you get at leisure. Will give you all, but don't look for me in Grand Rapids. I got tax receipts for all our lands, and will forward them to you. Hammond is working for me, and at any time you should come, if I am away, he will show you the books, papers, and all."

Defendant says that, when spoken to respecting the state of the partnership accounts, it was when he was visiting at Grand Rapids, and that on those occasions he referred to Henry Hake as having the accounts in charge, and as able to give the desired information. Henry Hake, for the period covering any possible

dissatisfaction, was, as the representative of the complainant, the bookkeeper of the firm.    He visited his father frequently during that time, and it seems almost incredible that complainant was ignorant of the state of the partnership affairs; and it is significant that, notwithstanding this situation, for all these years, not a suggestion of improper conduct on the part of the defendant was made.

The purchase of these lands was not authorized by complainant. It was not within the scope of the partnership business.    The purchases were made openly and without concealment. It does not appear that partnership funds were used in connection therewith, but it satisfactorily appears that the purchases were made with individual funds and credit, and there was no such confusion of the funds as entitles complainant to participate in the profits of those transactions.

The decree below, so far as it relates to these dealings, is, therefore, reversed, and the record remanded, with costs to defendant.

GRANT, MONTGOMERY, and HOOKER, JJ., concurred. LONG, J., did not sit.