GOLDMAN and others, Appellants, vs. COSGROVE, imp., Respondent.

*September 24—October 19, 1920.*

*Joint adventurers: Organizers of syndicate: Duty of members to make full disclosure: Good faith: Secret profits: Undisclosed commission: Liability: Remedies: Parties to action: Judgment: Accounting and money damages: Joint tortfeasors.*

1. When one becomes a member of a group united to prosecute a common enterprise such as the purchase of property, each member owes to every other member the duty of fair, open, and honest disclosure, and no member can, by connivance, deceit, or suppression of facts within the right or to the advantage of any other member to know, procure or accept secret profits, commissions, or rebates to the disadvantage of the others; and he holds gains acquired by his breach of

faith for the common benefit of his associates in proportion to their respective interests. A violation of his duty constitutes actionable fraud, and the usual remedies for the redress of fraud are available.

2. Where defendants, seeking to interest plaintiffs and others in the acquisition of an oil property, not only suppressed the fact that there was a $50,000 secret profit to them, but positively represented that the only commission on the purchase was one of $10,000, which the owner was paying to two of them and which they were reinvesting in the property, co-investors can recover for such fraud, the defendants being charged with the duty of full and fair disclosure of all material and important facts.

3. Where defendants learned that an owner of oil property would take $150,000 for his property, and, acting on the information, endeavored to make a sale for $200,000 to a syndicate organized by them, in forming the syndicate and becoming investors the duty they assumed towards their co-investors would prevent their securing a secret profit.

4. A defendant who knew that two of his associates were making a secret profit in an enterprise they were promoting, and, assuming he would participate in such profit, endeavored to secure other investors to whom he represented that every one was coming in on an equal basis, and who later received a share of the profit, must account therefor in an action by his co-investors. Where it appeared that such defendant had put it out of his power to convey the larger part of his interest, unlawfully acquired, a money judgment will be entered against him as a joint tortfeasor for the entire amount of the secret profit.

APPEAL from a judgment of the superior court of Douglas county: SOLON L. PERRIN, Judge. *Reversed.*

This is an action brought by the plaintiffs to recover from the defendants the amount of a secret profit alleged to have been made by the defendants in the purchase, by a group or association of persons composed of plaintiffs and defendants and others, of an oil property in the state of Kansas. It appears that on or about November 1, 1917, one Batman owned an oil property in Butler county, Kansas, consisting of a quarter-section of land, upon which there existed some half a dozen flowing oil wells, which property he had leased to the Empire Gas & Fuel Company,

by the terms of which lease one eighth of all the oil produced constituted a royalty to the owner. The defendants R. J. Pryor and C. H. Martin were associated in the business of dealers in oil properties under the firm name of Pryor & Martin at Wichita, Kansas. The defendant Fred Tudor was apparently associated with them in some way, the exact character of his relations with them not very plainly appearing.

It is claimed by Pryor, Martin, and Tudor that on or about November 1, 1917, they secured an oral option for the purchase of this property at the sum of $150,000. They immediately endeavored to secure a sale of the property at the sum of $200,000. After failing in this, at Kansas City, they induced another oil-brokerage firm, Pryor & Maloney, of Duluth, to endeavor to form a syndicate for the purchase of the property for the sum of $200,000. The Pryor of the firm of Pryor & Maloney is a brother of R. J. Pryor, defendant herein. Pryor and Martin and Tudor then personally undertook the forming of a syndicate in Duluth for the purchase of the property at $200,000. One of the first men interested by these promoters was one F. C. Harris, a business man of Duluth. It was agreed that the property should be deeded to F. C. Harris, who should hold the same as trustee, and who should then execute to the various investors such an undivided interest in the whole property as each investment bore to the purchase price thereof, namely, $200,000.

By the 26th day of December, 1917, they had obtained cash from investors in the proposition in the amount of $29,000. On that date this amount was paid over to one J. B. Clark, and he executed to F. C. Harris an instrument in the nature of a land contract whereby, in consideration of the payment of $150,000, $29,000 of which was paid on that date, $21,000 of which was to be paid on or before January 15, 1918, and $100,000 on or before February 15, 1918, a good and sufficient title to said oil property was to

be conveyed to said F. C. Harris. Thereafter other investors were secured in the proposition and $100,000 in cash was raised. This was paid to Clark, who executed a mortgage on the property for the remaining $50,000, and a deed of the property was executed to Harris. Harris then had title to the property as trustee, subject to the $50,000 mortgage which had been given back to Clark. The relation of Clark to the property, and the reason for his giving the land contract, does not appear.

The denominator of the interests which the respective investors held in the property was thereafter reduced to $150,000, instead of $200,000, because, as was represented, $150,000 was all that had been paid on the property, and such interest was subject to the mortgage for $50,000.

The defendant *Cosgrove* was one of the first to subscribe for an interest in the proposition. His subscription was for $10,000. He was very active in the matter of exploiting the proposition of securing investors therein, acting throughout the campaign in conjunction with Pryor, Martin, and Tudor. To all prospective investors he represented himself as an investor to the extent of $10,000 and said that he was making arrangements to invest $5,000 more. Tudor and Martin represented themselves as investors to the extent of $10,000.

It is a verity in the case that neither *Cosgrove,* Pryor, nor Martin invested a dollar in the proposition.

On the 7th day of March, 1918, at the Hotel Radisson, in Minneapolis, Harris, Pryor, *Cosgrove,* and Martin mutually agreed that the $50,000 difference in the purchase and selling price of the property should be divided equally between them after all necessary expenses were paid. This agreement is in writing and is an exhibit in the case, and there is no dispute about the matter.

The plaintiffs in this action claim that they were induced to invest in the proposition upon the representations made by Pryor, Martin, *Cosgrove,* and Tudor that the purchase

price of the farm was $200,000; that that was the amount that was to be paid to the owner; and that no commissions or secret profits would accrue to any one, except that Batman, the owner, was paying Pryor and Martin a commission of $10,000, which Pryor and Martin were investing with the other investors in the proposition.

This action is brought by the plaintiffs for an accounting, with a prayer that the defendants be compelled to account for all secret profits made by them, and that they be compelled to convey to the plaintiffs, and to others similarly situated who may become parties to this action, the said interest in said premises so wrongfully held by them, and in case it should be found that, for any reason, they have put it out of their power to make said conveyance, that they be held to respond to the plaintiffs, and to others who may be similarly situated and who may become parties to this action, for damages.

The case was tried before the court without a jury, and findings of fact and conclusions of law were made and filed, upon which judgment was rendered dismissing plaintiffs' complaint, from which judgment so rendered plaintiffs bring this appeal.

For the appellants there were briefs signed by *Steele & Tipton* of Superior and *Fryberger, Fulton & Spear* of Duluth; and the cause was argued orally by *H. C. Fulton* and *W. M. Steele*.

For the respondent there was a brief by *Grace, Fridley & Crawford* of Superior, and oral argument by *W. P. Crawford*.

OWEN, J.   The facts entitling plaintiffs to recover are either verities in the case or established by an overwhelming preponderance of the evidence.   When one becomes a member of a group or association of individuals united for the purpose of prosecuting a joint or common enterprise, such as the purchase of property, each member of the group

owes to every other member thereof the duty of fair, open, and honest disclosure, and no member thereof can by connivance, deceit, or suppression of facts within the right, or to the advantage of every other member thereof to know, procure or accept secret profits, commissions, or rebates to the disadvantage of his co-adventurers. His relation to his associates is one of trust and confidence, and he holds gains acquired by his *mala fides* for the common benefit of his associates in proportion to their respective interests. A violation of his duty in that regard constitutes actionable fraud, and the usual remedies for the redress of fraud are available. This principle of law has been declared and applied over and over again by the decisions of this court, some of which are *Grant v. Hardy,* 33 Wis. 668; *Pittsburg M. Co. v. Spooner,* 74 Wis. 307, 42 N. W. 259; *Fountain Spring Park Co. v. Roberts,* 92 Wis. 345, 66 N. W. 399; *Franey v. Warner,* 96 Wis. 222, 71 N. W. 81; *Hebgen v. Koeffler,* 97 Wis. 313, 72 N. W. 745; *Morgan v. Hodge,* 145 Wis. 143, 129 N. W. 1083; *Jones v. Kinney,* 146 Wis. 130, 131 N. W. 339.

It is a verity in the case that the defendants *Cosgrove,* Pryor, and Martin were, or pretended to be, investors in the enterprise and acquired substantial interests in the property. This fact alone laid upon them the duty of full and fair disclosure to their associates. They not only suppressed important and material facts, but the overwhelming preponderance of the evidence shows that they indulged in positive misrepresentation. Every investor who was a witness at the trial, eight in number, some of whom are not parties, testified with monotonous unanimity that either *Cosgrove,* Pryor, or Martin gave them positive assurance that the property was owned by Batman; that his price therefor was $200,000; that $200,000 was the sum he was to be paid; that there were no commissions to be paid to any one, except that Batman was paying Pryor and Martin $10,000 as commission for making the sale, which sum

Pryor and Martin were investing along with the others in the proposition; that every one was getting in on an equal basis and on the ground floor.

Besides this unvarying testimony on the part of the eight investors who were witnesses in the case, a copy of a prospectus was introduced in evidence, which a number of the investors testified was shown to them by one or the other of the defendants, Pryor, Martin, or *Cosgrove*. This prospectus was gotten up after $29,000 had been paid on December 26th and the contract executed between Clark and Harris. It showed, under separate headings, the description of the property, illustration of approximate profit, future possibilities, plan for raising and handling money, the title to the land, present shareholders, among whom appeared the defendant *E. S. Cosgrove* for the amount of $10,000, and Pryor and Martin, agents, for the amount of $10,000, the plan of payment, in which it was stated that $79,000 had already been paid on December 27, 1917 (whereas, as a matter of fact, only $29,000 had been paid, the difference between $29,000 and $79,000 representing the secret profit of $50,000) ; and under the heading of "Promotion Expense" appears this statement: "$10,000 commission is being paid by the present landowners to Pryor and Martin, investment brokers at Wichita, Kansas, for completing the sale of this property, and these men are putting their commission back into the property for an undivided one-twentieth interest." The existence or use of this prospectus is not denied by Pryor or Martin. *Cosgrove* testified: "I saw the prospectus Mr. Beals [a salesman] had in Pryor & Martin's office at the time he was trying to sell some of this stock to Mr. Leithhead. The only time I saw this prospectus was in Pryor & Martin's office. Beals was there at the time. I cannot say as to Pryor. I objected as to some of the names appearing on it. I do not know whether he made a new one or what he did."

When we consider the ubiquitous activity of *Mr. Cos-*

*grove* in promoting this enterprise, and his familiarity with the entire situation as pervades the record from start to finish, it is difficult to believe that he was quite as innocent of the existence of this prospectus as he claims to be. That it was used as testified to by the investors, and the representations therein contained urged upon them for the purpose of inducing them to join in the enterprise, can scarcely be doubted.

Upon these facts the principle of law stated at the opening of this opinion is clearly applicable. Every condition necessary to create liability on the part of the defendants exists. Defendants were co-investors with the plaintiffs. By reason of this relation the law imposes upon them the duty of full and fair disclosure of all material and important facts to their associates. They not only suppressed the fact that there was a $50,000 rake-off in the deal, but positively represented that the only commission arising or accruing from the transaction was a commission of $10,000 which Batman was paying to defendants Pryor and Martin, and which they were re-investing in the property as a testimonial of their confidence in the character of the investment.

It is the position of the defendants that they were not selling Batman's property, but were selling their own property, and that they were privileged to fix their own price upon it because it was their own property. They claim that it was a perfectly legitimate transaction for them to buy the property from Batman for $150,000 and sell it to this syndicate for $200,000, and cite the case of *Milwaukee C. S. Co. v. Dexter,* 99 Wis. 214, 74 N. W. 976. In that case the defendant Dexter had contracted for the purchase of a piece of land for the sum of $22,500, paid $6,000 of the purchase price thereon, obligated himself not only to pay the balance, but bound himself personally to erect and construct certain buildings, machinery, and outfits necessary for the cold-storage business, and to operate the same for seven years, and not to transfer the contract nor his right in the premises

without the approval of Lindsay Bros. In that case it was held that Dexter, in turning the property over to the corporation in which he was a stockholder, was dealing with his own property and might fix his own price therefor, without liability on his part to account to the corporation or to the stockholders thereof for the profit made by him in the transaction. There is no similarity between that case and this. As said in *Franey v. Warner,* 96 Wis. 222, 236, 71 N. W. 81:

"Cases cited, where a person sells his own property to a company in which he is interested at an increased price, fairly and openly, free from representations that he is selling the property of another, have no application to this case."

The defendants here failed to show that they had any interest whatever in the oil property. They claimed that Mr. Tudor had an oral option thereon. That is all that appears in the record. It does not appear from whom he got it, how long it was to run, or the manner in which payments were to be made. Not a dollar was ever paid for it. None of the defendants' money ever went into it even to this day. They had not a shadow of enforceable interest in it. The suspicion is very strong that what they termed an option amounted to no more than information on their part that Batman would take $150,000 for the property, acting upon which they endeavored to make a sale thereof for $200,000 and pocket the difference. Under some circumstances they might have done this, but when they formed a syndicate, so to speak, and became co-investors, the duty which they assumed towards the other investors prevented their profiting by any such duplicity.

The defendant *Cosgrove* is the only defendant before the court, the others not having been served, and we are principally concerned with his relation to this transaction, although the foregoing understanding of Pryor and Martin's relation thereto is essential to an understanding of *Cos-*

*grove's* position in the matter. *Gosgrove* testified at length, and it may be stated, generally, that he became acquainted and impressed with this property through a personal investigation thereof; that prior thereto he was more or less familiar with oil property in Kansas, having made other investments in that vicinity. Early in the campaign he subscribed for a $10,000 interest in this property. Thenceforward he was exceedingly active in making sales of interests in the property and of securing investors in the proposition. To all he represented himself as an investor to the extent of $10,000 and that his activity was prompted by a desire to see the proposition go through. He claims that he understood that Pryor and Martin were selling this property for $200,000; that he did not know the amount of the profit Pryor and Martin were making on the property until the memorandum agreement was signed at the Radisson Hotel in Minneapolis, and by which it was agreed that the $50,000 profit should be divided equally between himself, Pryor, Martin, and Harris. Before that time Pryor had given him his word that he would take care of him. He assumed there would be sufficient profit to take care of himself, partner, and any one who assisted him. After he learned of the $50,000 profit and accepted his proportion thereof, he went on selling interests in the property. He had spent $2,500 of his own money in promoting the enterprise and he received a $15,000 interest in the property.

That, in general, is the impression *Mr. Cosgrove* sought to convey by his testimony upon direct examination, and that really is all that is necessary for us to know. As far as he is concerned, we might as well let the case rest there. It seems that he himself knew that Pryor and Martin were making a commission out of the deal, although he did not know the amount thereof; that he went on spending his own time and money in promoting the enterprise upon the faith that Pryor would take care of him. He did not know what the margin of profit was, but assumed it would be sufficient

to take care of him.   Being a co-investor with the others, he accepted this secret commission, said nothing about it to his co-investors, but after that continued his efforts to secure additional investors.    But here is some of his cross-examination:

"*Q.* Did Mr. Pryor tell these plaintiffs he was selling the property, it was his property?  *A.* Selling Batman's property.   He had an option on the Batman property, and was selling it.

"*Q.* Did he tell them what Batman's price on that was? What they were paying Batman?   *A.* Told them the price was $200,000.

"*Q.* There has been some talk here by all these plaintiffs about Pryor and Martin said they were getting $10,000. Did you ever hear about that?   I mean back of that time, during the deal?   *A.* I think I heard something about that.

"*Q.* Did they [plaintiffs] inquire if there was any commission or rake-off to you and Harris?   *A.* I cannot recall.

"*Q.* You would not say that they did not make such inquiry?  *A.* I would not say that they did not.   I do not recall any."

He further testified that he told Mr. Seddon, one of the investors, that everybody was going in on the same basis, the investors as well as the men who held the option.   Each investor was going in on a $200,000 basis.

From the foregoing it appears pretty plainly that whether he knew the exact amount of the rake-off Pryor and Martin were getting out of the transaction, he did know there was a rake-off and that he did represent to all investors that every one, including plaintiffs and defendants, were going in on an equal basis; that during all this time he assumed there was a rake-off, and that it would be sufficient to take care of him, all of which he concealed from his co-investors; that when the amount of the rake-off was revealed to him and an equal division thereof arranged between himself, Pryor, Martin, and Harris, after the expenses were paid, he accepted and pocketed his share thereof, and said nothing to his co-

investors up to that time, but continued his solicitation of other investors.

The findings of the trial court completely exonerate the defendant *Cosgrove* (and the other defendants as well) from any culpability in the matter, and stamp their conduct throughout with unrestrained judicial approval. The findings do not deal with the real issuable facts in the case. It is not found whether the plaintiffs and defendants were co-investors, whether defendants were selling their own property, whether a secret commission was made, whether it was represented that all were going in on an equal basis, nor whether the representations with reference to commissions testified to by investors were made or not. The findings upon questions affecting the legal liability are more in the nature of legal conclusions than findings upon issuable facts. For instance, it is found

"That as between the plaintiffs and the defendants, and especially the defendant *Cosgrove,* no fiduciary relations of any sort or description ever existed as to the subject matter of this controversy, and that the plaintiffs did not, or did any of them, at any time have any right to rely upon the statements of any of said defendants, especially defendant *Cosgrove,* to any extent or degree, except such reliance as they might reasonably indulge in as respected the attitude of said defendants as sellers or vendors of the property."

And again:

"That all the negotiations leading up to the consummation of the several sales of the several fractions to the plaintiffs in this action, and others similarly situated, were made without fraud, concealment, misrepresentation, or other illegal contrivance or unlawful device."

As will be noted, these findings are really legal conclusions and amount to this: The actions of the defendants did not constitute fraud. There is no finding, however, as to what their actions were, and we are led to doubt whether the learned trial judge had in mind the principle of law which

controls this case, as herein stated.   If he did have it in mind, and it was his purpose to find that the defendants were not guilty of conduct bringing them within that principle, then we readily reach the conclusion that his findings are against the overwhelming preponderance of the evidence.

The complaint prays for the decree of the court to make an accounting of all that was done by them (defendants) in the premises; that they be compelled to account for all secret profits made by them; and that they be compelled to convey to plaintiffs, and to others similarly situated who may become parties to this action, the said interest in said premises so wrongfully held by them; and in case it shall be found that, for any reason, they put it out of their power to make such conveyance, that they may be held to respond to the plaintiffs, and to others who may be similarly situated and who may become parties to this action, for damages sustained by such plaintiffs and such parties.   Judgment can go against *Cosgrove* only, as he was the only defendant served. It appears that he has put it out of his power to convey the larger portion of his interest unlawfully acquired.   A money judgment for damages will therefore go against him.   He, being a joint tortfeasor, is liable for the entire amount of the secret profit, amounting to $50,000.   The plaintiffs are entitled to judgment for such proportion of $50,000 as their respective interests bear to $150,000.   In order to ascertain this an accounting will have to be taken.

*By the Court.*—Judgment reversed, and cause remanded with instructions to enter judgment in favor of the plaintiffs and against the defendant *Cosgrove* for such proportion of $50,000 as, upon accounting, it shall appear that their respective interests in the property bear to $150,000.