JOHNSON *v.* IRONSIDE.

1. MINES AND MINERALS—JOINT ADVENTURES.
   Projects for development of oil wells have been held to be joint
   adventures or mining partnerships.

2. SAME—PARTNERSHIP—RULE OF GOOD FAITH AND FAIR DEALING
   APPLICABLE.
   Partners in mining partnership are held to same strict rule of
   good faith and fair dealing towards each other in relation to
   management and disposition of social property as general
   partners.

3. PARTNERSHIP—DUTY OF PARTNER TO ACCOUNT.
   One partner may not, directly or indirectly, use partnership
   assets for his own benefit, take any profit clandestinely, carry
   on business of partnership for his private advantage, carry
   on another business in competition with that of partnership
   without accounting to copartners, or avail himself of knowl-
   edge or information which may properly be regarded as part-
   nership property.

As to effect of secret advantage to one member of joint adven-
ture, see annotation in 50 L. R. A. (N. S.) 1046.

4. Joint Adventures—Duty of Each Member to Others.

Each member of group or association of individuals united for purpose of prosecuting joint or common enterprise owes to every other member thereof duty of fair, open, and honest disclosure, and no member may, by connivance, deceit, or suppression of facts, within the right, or to the advantage of every other member to know, procure or accept secret profits, commissions, or rebates to disadvantage of coadventurers.

5. Same—Fiduciary Relations.

Test of existence of fiduciary relationship between joint adventurers is whether transaction is in relation to social property or within scope of social business.

6. Mines and Minerals—Joint Adventures—Duty to Account for Secret Profits.

Where manager of syndicate, owning permit for gas and oil, as such received gift of permits to be used for purpose of drilling deep test well on syndicate lands, he and certain associates, who sold part of acreage donated without applying proceeds to finishing of test well, and who attempted to retain other of the gift acreage for themselves, are liable to account to other members of syndicate, not parties to the secret plan, for profits therefrom.

7. Same.

That manager of syndicate prospecting for gas and oil could have sold to strangers at his own price permits donated for benefit of syndicate, did not relieve him and his associates from liability to account to other members of syndicate for secret profits from property donated.

8. Joint Adventures—Trust Relationship.

Law will not permit those associated in relationships in which mutual trust and confidence are ingredients to put themselves in position where their individual interests may have tendency to cause them to relax in their vigilance for the common good, or to make secret individual profits out of common activities.

Appeal from Barry; Hawley (Royal A.), J., presiding. Submitted October 25, 1929. (Docket No. 120, Calendar, No. 34,446.) Decided December 3, 1929.

Bill by Aben E. Johnson and others against Gordon Ironside and others for an accounting of profits. From a decree for plaintiffs, defendants appeal. Affirmed.

*Philip T. Colgrove* and *Edward C. McCobb,* for plaintiffs.

*Kim Sigler* and *Knappen, Uhl & Bryant,* for defendants Cook, Stebbins, and Ironside.

FEAD, J. This is an action for accounting of profits. In 1925 William Dooley, formerly a resident of Hastings, owned an oil and gas prospecting permit on 2,560 acres of land near Artesia, New Mexico, purchased from one Simmons. His brother, Andrew, residing in Hastings, visited him, and on his return home brought an offer from William to sell an undivided half interest in the permit for $8,400. Andrew interested plaintiffs and the other defendants in the matter, and they subscribed and paid the purchase price. Under direction of William Dooley, the assignment from Simmons was taken to defendants Cook and Ironside, without designation as trustees, for the purpose of more convenient handling of relations with the government. October 7, 1925, Cook and Ironside made a declaration in writing, stating the interests of the respective parties. They were not named as trustees nor their powers stated, but they confessedly held as trustees and afterwards acted as such, with power to sell. William Dooley had given his wife and his brother Andrew each a quarter interest in the permit, and they were so designated in the declaration of trust. The gift to the wife was made because of government restrictions regarding the number of permits

a person might have in a structure. Dooley, however, was the party in interest.

In addition to the sum of $8,400 paid him and as part of the consideration for the purchase, William Dooley agreed to sink a test well on the premises to a depth of 500 feet, and to attempt to secure donations of cash and property from others in the neighborhood in order to drill a deep test well of 2,000 to 2,500 feet or more. He was given full charge of operations, with authority to use his own judgment as to procedure. He drilled an 800-foot well at his own expense, and then for a time suspended work. He secured contributions of money and property, aggregating some $5,000, for the project. He conducted a mass of correspondence with defendants, none with plaintiffs.

In November, 1925, Dooley obtained from Mrs. Hobbs and Mrs. Hinkle the donation of two permits adjoining the Simmons (afterward in the record called the Cook-Ironside) permit on the south. The donations were absolute, save for reservation to donors of 7½ per cent. royalty of oil and gas produced, and were made for the express purpose and with the definite understanding that the entire proceeds from their sale and disposition should be used in drilling a deep test well on the Cook-Ironside permit. Dooley gave his personal promise to donors that he would validate the permits according to government regulations. The government afterward granted an extension of these permits on the strength of such complete donation. Validation required either drilling of test wells, or approved extensions, based on donations, until the Cook-Ironside well should produce, and then proper test wells on the premises. The donors had confidence in Dooley, and made no restrictions on his manner of handling and

disposing of the permits. All the defendants knew the conditions and purpose of the donations.

November 21, 1925, two days before Dooley had a written agreement for the donation of these permits, he wrote his brother Andrew at Hastings that he thought he could get one-half interest in the permits for $14,000, the entire amount to go into the drilling fund for the Cook-Ironside test well. He suggested that if the deal were made, the $14,000 should be refunded to the purchasers out of oil runs from the Cook-Ironside well in the event of its producing, if approved by "Cook, Ironside, *et al.*" William Dooley intended to retain one-quarter interest and to give Andrew one-quarter interest.

On receiving William's letter, Andrew Dooley took up the proposition with the other defendants, and, the next day after William had received a written offer to donate the two permits, Andrew wired him to close the deal at once, a letter would follow. This letter was not produced. Nothing had been said to plaintiffs then, nor were they afterward consulted, nor did they know of the proposition nor of any subsequent transactions regarding the permits until a short time before this suit was commenced. Defendants sedulously refrained from informing plaintiffs of anything connected with the matter. The testimony did not show that William Dooley then knew that plaintiffs had not been consulted. However, he later knew that they had been left out.

The deal was not closed on the basis of the original letter. Nothing definite was done until the holidays of 1925, when William Dooley came to Hastings and discussed the matter at length with defendants. The subsequent correspondence leaves little doubt of the result of that conference. William Dooley at first suggested that $7,000 be raised on

each permit to contribute to the Cook-Ironside well and to validate the Hobbs-Hinkle permits. Later in the conversation he said he thought he could obtain sufficient contributions from others so defendants would not be asked to pay over $5,000 in any event, probably not more than $2,500, toward drilling the Cook-Ironside well. The plan finally worked out was that, instead of one-half interest, William Dooley retained one section, 640 acres, for himself, one for his New Mexico partner, Yates, each defendant was to have one section individually, and defendants agreed to conduct a campaign to sell the balance of the acreage, 1,264.15 acres, at $10 per acre, with an additional $10 per acre to be paid by the purchasers if Cook-Ironside well became a good producer. Title to the Hinkle permit was to be taken in the name of Andrew Dooley and to the Hobbs permit in the name of defendant Stebbins. The assignments of the permits were not made until March, 1926, were not approved by the government until October 20th, and on November 13, 1926, because of trouble between Andrew Dooley and the other defendants, they were assigned to Cook.

Defendants began a sales campaign at once after the conference with Dooley, and finally disposed of 775 acres for $7,750 in cash, and also gave some of the acreage for services performed. In February, 1926, they deposited $2,480 of the proceeds of sales in Artesia banks for the Cook-Ironside drilling fund. A little later, William Dooley asked defendants for a guarantee of $5,000, which, with anticipated contributions from others, would enable him to let a contract for drilling. After some discussion by mail, defendants executed an agreement on April 23d, to pay on demand the sum of $2,520 toward the Cook-Ironside drilling fund, which, together with the

$2,480 in the Artesia banks, made a total of $5,000, on condition that interested parties at Artesia furnish an additional $5,000 toward the completion of the Cook-Ironside well. At that time defendants had in Artesia and on hand at least $4,750, derived from sale of acreage.

The contract was let, drilling began and continued until on or about September 4th, to a depth of 2,040 feet, without striking oil. The initial sum of $2,480 was paid to the drillers. About the middle of August, William Dooley asked defendants for $2,520 under the guarantee. They refused to send it because the assignments of the permits had not been approved by the government. Defendants complained to Dooley that they had been selling lands without having title, and, if the assignments were not approved, they would be responsible to the purchasers, not only for the amount they had on hand, but also for the $2,480 already expended. Both because defendants refused to send the money, and also because neighboring owners were not contributing as liberally as Dooley thought they should, drilling was suspended. After approval of the assignments by the government, defendants paid about $3,000 on the drilling indebtedness, all from the sale of acreage rights, and have some $1,500 still unexpended. At no time did any of them put any of his own funds into the transaction. No further work has been done on the well.

In January, 1927, negotiations occurred for blocking the Cook-Ironside, Hobbs and Hinkle permits with others in what is called a checkerboard arrangement. The deal was finally consummated. The checkerboard arrangement was with Getty & Company, provided for transfer of one-half interest in each of the permits, Getty & Company to validate

them, and required the first well to be drilled on the Mesa permit, and, if that produced, the next should be on the Hinkle permit, 250 feet away. The Mesa well produced. Oil was struck on the Hinkle permit. In November, 1927, after some negotiations, Getty & Company purchased the Hinkle permit for $96,000, $32,000 of which was paid in cash and $64,000 was to be paid out of the oil runs. The $32,000 was received by defendant Cook, and is now on deposit in a bank awaiting the disposition of this suit.

The court granted a decree in favor of plaintiffs for shares in the moneys on hand, and to be received from the Hinkle sale, and in the Hobbs permit, in accordance with their interests in the Cook-Ironside Syndicate, validated the transfer to Getty & Company, and protected the purchasers of acreage. Because plaintiffs have not appealed, the decree ·is before us only as to the accounting for the moneys and the Hobbs permit.

Plaintiffs contend that the Cook-Ironside Syndicate was a joint adventure, and defendants, as members, took the Hobbs and Hinkle permits as trustees for all members, and must account for the profits. Defendants contend that the syndicate was a mining partnership, which differs from a commercial partnership, in that one partner may buy the interest of another or an outstanding interest without consent of his partners (*Kahn* v. *Smelting Co.,* 102 U. S. 641) ; urged that the same trust relations do not exist as among general partners or joint adventurers (see *Bissell* v. *Foss,* 114 U. S. 252 [5 Sup. Ct. 851] ; *Harris* v. *Lloyd,* 11 Mont. 390 [28 Pac. 736, 28 Am. St. Rep. 475]) ; that they bought the permits in good faith; and that as purchase price they assumed the obligation to pay the cost of drilling the Cook-Iron-

side well and of validating the Hobbs-Hinkle permits to a maximum amount of $14,000.

The claim of purchase is untenable under the facts. The correspondence conducted while the matter was being worked out contained no statement that defendants acknowledged or recognized an obligation to pay any sum unconditionally, except the guarantee hereinbefore referred to, and which they virtually repudiated; demonstrates that defendants' position was that all contributions to the Cook-Ironside drilling fund were to be paid out of sales of acreage only; and makes plain that William Dooley's understanding was that defendants were not obligated to pay anything to the fund out of their own moneys. Nevertheless, defendants at once assumed the attitude of owners of the Hobbs-Hinkle permits. Their position was that they had a right to determine how much of the proceeds from sales of acreage should be donated to the Cook-Ironside well and how much be kept to validate the Hobbs-Hinkle permits; that they recognized an obligation to contribute to the Cook-Ironside fund, not by way of payment of purchase price, even to the extent of the whole revenue from sales of acreage, but in the capacity of adjoining owners making donations upon the same considerations and with like obligations in proportion to benefits as they thought should move other independent neighboring owners. They contended the Mesa permit, being closer than theirs to the Cook-Ironside, would more surely benefit by discovery of oil on the latter and should pay more than they. They wrote of demands for money for the Cook-Ironside drilling fund "as assessment from the lower permits," and asked William Dooley's advice on the advisability of purchase of other acreage as "compared with indefinite assessment against

the Hobbs & Hinkle permits.'' During the controversy over Dooley's request for payment of money under defendants' guarantee, and at a time when they had become alarmed at the delay in the government approval of the Hobbs-Hinkle assignments to them and at the possibility of their having to make refund to purchasers of the acreage, they considered making an assessment against the Cook-Ironside members to replace the moneys spent and guaranteed, and thus leave the Hobbs-Hinkle moneys intact.

It is clear that no purchase price for the Hobbs-Hinkle permits was set, paid by defendants, agreed to be paid by them, or an enforceable obligation therefor assumed or recognized by them. Dooley and defendants merely divided the major portions of the donations and appropriated them to themselves. At best, defendants became Dooley's associates, to perform his duty to sell the property and account for the proceeds to the Cook-Ironside drilling fund. However, the question of actual sale is more illuminative than decisive. The real issue is whether defendants violated a trust to plaintiffs which renders them accountable to the latter for profits.

Projects for the development of oil wells have been held to be joint adventures (*Crawford* v. *Forrester,* 108 Kan. 222 [194 Pac. 635]; *Turben* v. *Douglass,* 76 Okla. 78 [183 Pac. 881]; *Galbraith* v. *Devlin,* 85 Wash. 482 [148 Pac. 589]), or mining partnerships (1 Thornton's Law of Oil and Gas, § 351). While the latter has some special characteristics, yet the partners are held to "the same strict rule of good faith and fair dealing towards each other in relation to the management and disposition of social property" as general partners. *Wetzel* v. *Jones,* 75 W.

Va. 271 (84 S. E. 951); *Kimberly* v. *Arms,* 129 U. S. 512 (9 Sup. Ct. 355); 40 C. J. p. 1152; Mills & Willingham, Law of Oil and Gas, p. 282; Summers, Oil and Gas, 707.

As illustrating the degree of fidelity to the firm required of partners, the court, in *Latta* v. *Kilbourn,* 150 U. S. 524 (14 Sup. Ct. 201), enumerated the following well-settled rules:

"The general principles on which the court proceeded admit of no question, it being well settled that one partner cannot, directly or indirectly, use partnership assets for his own benefit; that he cannot, in conducting the business of a partnership, take any profit clandestinely for himself; that he cannot carry on the business of the partnership for his private advantage; that he cannot carry on another business in competition or rivalry with that of the firm, thereby depriving it of the benefit of his time, skill, and fidelity without being accountable to his copartners for any profit that may accrue to him therefrom; that he cannot be permitted to secure for himself that which it is his duty to obtain, if at all, for the firm of which he is a member; nor can he avail himself of knowledge or information, which may be properly regarded as the property of the partnership, in the sense that it is available or useful to the firm for any purpose within the scope of the partnership business."

As to joint adventures, it was stated in *Goldman* v. *Cosgrove,* 172 Wis. 462 (179 N. W. 673):

"When one becomes a member of a group or association of individuals united for the purpose of prosecuting a joint or common enterprise, such as the purchase of property, each member of the group owes to every other member thereof the duty of fair, open, and honest disclosure, and no member thereof can by connivance, deceit, or suppression of facts

within the right, or to the advantage of every other member thereof to know, procure or accept secret profits, commissions, or rebates to the disadvantage of his coadventurers. His relation to his associates is one of trust and confidence. and he holds gains acquired by his *mala fides* for the common benefit of his associates in proportion to their respective interests."

See, also, *Moe* v. *Lowry,* 69 Colo. 371 (194 Pac. 363); *Berry* v. *Colborn,* 65 W. Va. 493 (64 S. E. 636, 17 Ann. Cas. 1018); *Lind* v. *Webber,* 36 Nev. 623 (134 Pac. 461, 135 Pac. 139, 141 Pac. 458, 50 L. R. A. [N. S.] 1046, Ann. Cas. 1916A, 1202); *Nelson* v. *Lindsey,* 179 Iowa, 862 (162 N. W. 3); *Harm* v. *Boatman,* 128 Wash. 202 (222 Pac. 478); 33 C. J. p. 855 *et seq.*

The test of such fiduciary relationship is whether a transaction is in relation to the social property or within the scope of the social business. *Hake* v. *Coach,* 107 Mich. 197; *Latta* v. *Kilbourn, supra.*

The Hobbs-Hinkle permits were not gifts to William Dooley personally and for his private use. They were given to him as representative of the Cook-Ironside permit owners and developers, whoever they might be, and for the express benefit of their project. He obtained them in the course of his employment as manager of Cook-Ironside Syndicate, in pursuance of his duty as such under the agreed plan of procedure of the syndicate and for the sole and direct use and benefit of the syndicate property and operations. It would be difficult to find an instance of the act of a partner or associate in a joint enterprise more conclusively within the scope of the social business or in relation to the social property. Because of his membership in the syndicate and of his managing agency, Dooley held as trustee for all. Defendants knew the facts, and, therefore, took sub-

ject to the right of the others to participate in all the benefits of the transaction.

In addition to this, defendants, as members of the syndicate, had the same duty of good faith and fair dealing toward the others as had Dooley. This required complete disclosure of the facts to the other members, without which defendants personally could not take property devoted to the syndicate business.

It has been urged that plaintiffs have not been injured in any way by the acts of defendants. In an excellent opinion the chancellor demonstrated the contrary in connection with the checkerboard arrangement. It is also plain that if defendants had applied all the proceeds of the sale of acreage to the Cook-Ironside drilling fund, the well would have gone down a considerable distance farther and the probability of oil been more surely ascertained. If the value of the whole of the permits, computed on the basis of sales or even on the price defendants claimed they obligated themselves to pay, had been used in drilling, the presence or absence of oil would have been established beyond peradventure. Because of the failure of defendants to account for the value of the donations, the Cook-Ironside well remains unfinished and uncertain.

The fact that Dooley could have sold to strangers at his own price does not affect the liability. It is not a question of his authority from the donors or the syndicate, but of the obligation of himself and defendants to their associates in the project. Had he sold to strangers, in accordance with his duty, he would have sold all the property, presumably received its value, and all the associates would have benefited alike.

Nor does liability rest upon such other considerations urged by defendants as that defendants had no power to bind plaintiffs to the payment of a pur-

chase price or fulfilment of the conditions of the transaction, or that plaintiffs would not have participated in it had they been asked, or that defendants thought they had a right to do what they did. The rule rests upon legal duty. The law will not permit those associated in relationships, in which mutual trust and confidence are ingredients, to put themselves in a position where their individual interests may have a tendency to cause them to relax in their vigilance for the common good, or, without knowledge or consent of their associates, to make individual profits out of the common activities.

The decree is affirmed, with costs.

NORTH, C. J., and BUTZEL, WIEST, CLARK, MC-DONALD, and SHARPE, JJ., concurred. POTTER, J., did not sit.