MAROSIS et al. v. ALAMO AMUSEMENT CO. et al.

No. 2339.

Court of Civil Appeals of Texas. Beaumont.
May 11, 1933.

Rehearing Denied May 31, 1933.

Walter Groce, Sylvan Lang, and Leslie Byrd, all of San Antonio, for appellants.

Lewright & Lewright, C. W. Trueheart, and VanderHoeven & Greathouse, all of San Antonio, for appellees.

WALKER, Chief Justice.

On the 27th of March, 1925, appellants, Nick Marosis and Louis Santikos, of San Antonio, Tex., William Epstein, R. Jorrie, and Ralph B. Feagin organized as original incorporators, the Main Realty Company of Houston, Tex., a corporation with a capital stock of $12,500, divided into 125 shares, each of the par value of $100, subscribed and paid for as follows: Marosis $3,100, Santikos $3,100, Epstein $3,100, Jorrie $3,100, and Feagin $100. The Epstein, and possibly the Jorrie, stock was held by them for themselves, A. Kronsky, and possibly other associates. On the 3d day of April, 1925, Main Realty Company entered into a lease contract with the owners covering certain valuable unimproved real estate situated at the corner of Main street and McKinney avenue, Houston, Tex.; the lease was to run for 99 years, the first year rental was $12,500, which was to be increased from time to time during the life of the lease, and the lessee was to pay all taxes and certain other charges against the property during the life of the lease. On March 12, 1926, the Main Realty Company conveyed this lease to Main-McKinney Building Company, a corporation, for the consideration of $60,547.30 cash, and $250,000 to be paid in twenty-five equal yearly installments, payable September 1st of each succeeding year, beginning with September 1, 1927; the purchaser also assumed all obligations of every kind and character whatever owed by the Main Realty Company under the terms of its lease with the original owners of the property. From the cash paid for the lease each of the stockholders in Main Realty Company was repaid the entire amount invested by him in the enterprise, and the balance was divided among them in proportion to their stockholdings. Each of the appellants received ³⁄₄₂ of the net profits. The further payments on the lease were to be made to D. and A. Oppenheimer, bankers of San Antonio, for the benefit of the Main Realty Company stockholders. After this adjustment was made the Main Realty Company was dissolved.

In paying for his stock in Main Realty Company, appellant Santikos used $3,200 of the money of Alamo Amusement Company, a San Antonio corporation of which he was secretary and treasurer, and also loaned to appellant Marosis, the president of the corporation, $1,000 of the money of the Alamo Amusement Company, which he used in paying for his stock in Main Realty Company. Alamo Amusement Company had a capital stock of $125,000, divided into 2,500 shares, each with a par value of $50. At the time

Santikos took the $4,200 from the company, he and Marosis owned 1,405 shares of its capital stock, and the balance was held by Charles Siam, George and Willie Callins, Dave Bernard, and others. Santikos and Marosis afterwards increased their stockholdings, and in May, 1927, they owned 1,716 shares, which they sold to Epstein, Oppenheimer, and Kronsky, who were associated with them in the organization and promotion of Main Realty Company and the exploitation and sale of the lease on the Houston property.

On June 15, 1927, the above-named Charles Siam, George and Willie Callins, and Dave Bernard filed this suit against appellants, Marosis and Santikos, in the nature of a minority stockholders' bill in equity, alleging that appellants had wrongfully appropriated from Alamo Amusement Company the $4,200 used by them in paying for their stock in Main Realty Company. Alamo Amusement Company was made a party to this suit and first answered by plea in abatement, putting in issue the right of the plaintiffs to prosecute the suit for and on its behalf. However, by its second amended original answer, filed March 19, 1931, the corporation consented to the prosecution of the suit and adopted the allegations of the amended petition of the plaintiffs upon which the case was tried. Without summarizing the answer of appellants, it is sufficient to say that the issues upon which this appeal is prosecuted were duly raised by their pleadings. The case was called for trial on March 16, 1931, and continued on trial until conclusion of the evidence, when verdict was instructed in behalf of appellees, upon which judgment was entered in favor of Alamo Amusement Company against defendant Santikos for the sum of $12,292.78, with interest at 6 per cent. per annum, and against Marosis for $4,119.08, with interest at 6 per cent. per annum; that defendant Santikos was a trustee for the use and benefit of the Alamo Amusement Company, with respect to and to the extent of ³²⁄₁₂₅ of the future annual rental payments to be made by Main-McKinney Building Company, or its successors or assigns; a judgment of like character was rendered against Marosis for ¹⁰⁄₁₂₅ of such annual payments.

■ The instructed verdict was error. While the evidence was conflicting on the issue, the instructed verdict assumed that appellants Marosis and Santikos made their investment in the Main Realty Company as a personal venture and not for the benefit of Alamo Amusement Company, but under circumstances, sufficient as a matter of law, to make them constructive trustees for the use and benefit of Alamo Amusement Company.

■ Appellants first insist that though Santikos took and used $4,200 of the money of the Alamo Amusement Company, he took it

878

in good faith, believing that it was his, and in good faith invested it in the stock of Main Realty Company; and, as he replaced it soon after discovering his mistake, he was not guilty of such fraud, wrongful conduct, or breach of duty to the trust imposed upon him as an officer of Alamo Amusement Company as to authorize the courts to declare a constructive trust in its favor in his investment in Main Realty Company. On this proposition we agree with appellants that the court erred in refusing to submit to the jury the issue of good faith by Santikos, in taking the $4,200. The facts of this proposition are as follows: It is true, as insisted by appellees, that Santikos took this money without express authority from his board of directors, and without consulting them or any of the stockholders of the corporation, with the possible exception of appellant Marosis. But, in addition to his salary, Santikos had a "bonus" contract with Alamo Amusement Company, which was paid to him on his demand without special authority from his board of directors. Santikos testified as follows, explaining why he took the $4,200:

"Q. This is a check to Mr. Epstein for $4200.00 drawn by D. & A. Oppenheimer, Bankers, San Antonio, Texas? A. Yes, sir.

"Q. On the Guaranty Bond State Bank? A. Yes, sir.

"Q. Please state the circumstances under which that check was secured, if you know? A. When Marosis came back from Houston, told me to give them a check for $4200.00, and I called the bank as to my own personal account and I didn't have a sufficient amount to cover $4200.00, so I asked Mr. Young, the Bookkeeper of the Alamo Amusement Company—I had a copy of the Monthly Statement for the month of March, and that showed—

"Q. Month of March, or of February? A. Month of February, or March it showed I had a bonus coming to me of a little over five thousand dollars, and I told Mr. Young to issue me a check for $4200.00 and he gave me the check and I took it over to the bank and got credit—got—

"Q. A cashier's check? A. A cashier's check, yes, that is what I was going to say, after I got this, I did, I got a cashier's check and turned it over to Mr. Oppenheimer.

"* * * Q. You stated the Alamo Amusement Company, Mr. Santikos, that they recognized you had in that statement of February or March, 1925—Did you say February or March? A. I think, February or March.

"Q. When you looked at that statement of February, or March, 1925—this statement of February shows you had—there is shown an item of 'Bonus, L. Santikos' $5119.68. A. Yes, sir.

"Q. And that Mr. Young then issued you a check for $4200.00? A. Yes, sir."

Without quoting further from the testimony of the witnesses, the following quotation from the brief of appellees shows that the evidence raised the issue that Santikos took the $4,200, believing it was due him as a part of his "bonus": "Their testimony and that of their witness, the bookkeeper Young, is conflicting as to whether the money was borrowed on an 'I.O.U.' without interest, or taken by Santikos under a misapprehension as to there being a balance of bonus in excess of that amount due him." The testimony was further to the effect that at that time Santikos had no "bonus" coming to him, and when that fact was called to his attention he acknowledged his obligation to the corporation and afterwards, on the 20th of June, 1925, repaid the advancement in full. Santikos gave an I.O.U. to the Alamo Amusement Company for the $4,200, but the evidence was conflicting as to whether he gave the I.O.U. when he received the money or when he was informed that he was mistaken in taking this money as a part of his "bonus." The evidence was also to the effect that Santikos had many times taken various sums of money from the corporation as a "loan," for which he always gave his I.O.U. and which he always repaid without interest, and his conduct in this respect was never criticized by his directors or his stockholders, and in this connection the books of the corporation showed this $4,200 as a loan, which was not criticized or objected to by the directors or the stockholders.

On the facts stated, if the Main Realty Company investment was a personal investment by Santikos and not for the benefit of Alamo Amusement Company, and if the $4,200 was taken by him in good faith, he was not liable to the Alamo Amusement Company as a constructive trustee. In order to convert Santikos into a constructive trustee, and to create a constructive trust in his investment in Main Realty Company, appellees were required to show by pleading and proof that he was guilty of a fraud against Alamo Amusement Company. If he was not guilty of wrong, then he was not a constructive trustee, that is, a trustee ex maleficio or trustee de son tort. 39 Cyc. 184. A finding that he took the money in good faith would release him from liability as a constructive trustee. We think this conclusion necessarily follows from the following statement of the law by our Supreme Court in Hendrix v. Nunn, 46 Tex. 141: "It is evidently impossible to announce a formula which is applicable to, and that will embrace, every conceivable case in which a court of equity will hold a party to be a constructive trustee. It will be found, however, upon examination, that the cases to which this doctrine has been held applicable in the

'remedial justice' of courts of equity, are generally cases where there is some breach of duty or want of good faith and fair dealing on the part of the person acquiring the property, or of him from whom or under whom he has gotten it, of whom he has actual or constructive notice; or where the property has been acquired or possession of it taken on the assumption of a trust character, or under the belief by those with whom the transaction is had, or by reason of which it was acquired or possessed, that it was taken or acquired in trust; or where it has been gotten by some undue influence." Citing Hendrix v. Nunn, and Cole v. Noble, 63 Tex. 432, the court in Abilene State Bank v. Donnelly (Tex. Civ. App.) 277 S. W. 447, 448, said: "Constructive trusts always originate in fraud." See, also, Texas Creosoting Co. v. Hartburg Lumber Co. (Tex. Com. App.) 12 S.W.(2d) 169; Spencer v. Pettit (Tex. Civ. App.) 17 S.W.(2d) 1102; Spangler v. Spangler (Tex. Civ. App.) 26 S.W.(2d) 463; Miller v. Himebaugh (Tex. Civ. App.) 153 S. W. 338.

Appellees have thus answered appellants' proposition:

"The point they (appellants) urge as refuting our primary right to recover the proportional net profits realized by Marosis and Santikos with the $4200.00 is that, there being evidence showing the good faith of Santikos in believing a balance of bonus due him, and also evidence showing the payment on June 20, 1925, of $4200.00 without interest to the company by Santikos and Marosis, a court of equity is not warranted in declaring a constructive trust without submitting these issues to a jury; in other words, such facts, if found by the jury, would constitute a complete defense to this suit.

"Our position is that these things, if true, are utterly immaterial to the existence of the constructive trust declared by the trial court, that the wrong or constructive fraud giving rise to such trust is a breach of the fiduciary relation by these officers and directors of the corporation in undertaking to act for it in a transaction in which they were individually interested, viz.: the loan or payment of corporate money to themselves; that actual fraud is not an element necessary to the relief equity accords the corporation under such circumstances; that after corporate funds so obtained by these officers and directors were actually used in the Houston lease purchase, the return of a like amount to the corporation did not affect its right to enjoy the proportional benefit in net profits realized by the use of its money; that actual damages is not a predicate for such relief, nor do their absence avoid the equitable principle invoked.

"The dual capacities in which Marosis and Santikos were undertaking to act in this transaction render them incompetent to act for the corporation, and there being no other officer or agent of the corporation even consulted about the matter it is just as though Marosis and Santikos as strangers to the corporation appropriated $4200.00 of its money. Under such circumstances neither their intention to return the money nor their belief that it was owed to one of them would justify their act; nor would their return of a like amount after these corporate funds had served their purposes and after they had discovered their mistake about its being owed Santikos, right the wrong that had been done the corporation through their appropriation and use of its money."

The authorities cited by appellees, as we construe them, do not sustain their contentions. In the authorities cited by them the trustees dealt with the trust funds, knowing at the time that they were holding the funds in trust, but, notwithstanding, they dealt with the funds to their personal advantage. Under such facts it is the law that the trustee cannot use trust funds to secure a personal advantage, whatever may be his motive or his good faith towards those whose funds he holds.

Appellant Marosis raised the issue in his behalf that he did not know that the $1,000 loaned him by Santikos was the money of the Alamo Amusement Company until after he had used it in paying for his stock in the Main Realty Company. This issue should have been sent to the jury for, if found in his favor, he would be relieved of any charge of constructive trust.

Because Marosis did not repay the $1,000 to Alamo Amusement Company as soon as he was informed of its true ownership, appellees erroneously insist that, as a matter of law, he became a constructive trustee and was liable as such. If Marosis borrowed this money in good faith, he was entitled to the profits of his investment in Main Realty Company. Of course, knowing before he repaid the money to Santikos that it belonged to Alamo Amusement Company, he was directly liable to that company for its repayment, but that was the full extent of his liability. As Santikos repaid the $4,200 in full, Marosis, under this proposition, was relieved of all further liability.

Even if appellants Marosis and Santikos invested the $4,200 as constructive trustees for Alamo Amusement Company, the court erred in dividing the profits of Main Realty Company upon the basis of their stockholdings in Main Realty Company. The facts of this proposition are as follows: William Epstein, one of the incorporators of Main Realty Company, together with his associates, A. Kronsky, R. Jorrie, and possibly others, were the first ones interested in the Houston lease. Epstein, representing his as-

sociates, invited Marosis and Santikos to join them in handling the lease. After investigating the property, these parties agreed to take the lease and also to improve the property for theater purposes. For the purpose of leasing the property and improving it after it was leased, they agreed further to raise among themselves the sum of $150,000. The joint enterprisers further agreed to organize the Main Realty Company with a nominal capital stock of $12,500, to take and hold the title to the lease for their benefit, and that all the capital stock of the corporation should be used in paying the rental for the first year. This part of the agreement was immediately put into execution, that is, the capital stock of $12,500 was paid into the corporation and immediately paid on the first year lease. For the purpose of improving the property, as per their original plans, the joint enterprisers entered into a contract with J. W. Colvin to transfer the lease to him and to take preferred stock in his improvement company to the amount of $150,000, of this sum $12,500 was to be represented by the original investment in Main Realty Company, and the balance, in the sum of $137,500 by letters of credit. This contract was made in the name of Main Realty Company and personally indorsed by the joint enterprisers, the agreement among them being that these letters of credit should be furnished by them in proportion to their stockholdings in Main Realty Company. This part of the agreement was duly executed by furnishing the letters of credit to the full amount of $137,500, of which sum Marosis and Santikos furnished $70,800. They raised this money by borrowing it from their San Antonio bank, giving their bank a note secured by a pledge of their stock in Alamo Amusement Company. The Colvin contract was not executed. Mr. Jesse Jones of Houston, Tex., became interested in this property soon after the lease was made to Main Realty Company and offered the joint enterprisers $50,000 for their lease. This they refused. Then Mr. Jones associated himself with Mr. Colvin in the execution of the Colvin contract. Afterwards, by consent of all parties, the Colvin contract was canceled and the lease was sold to Main-McKinney Building Company, one of Mr. Jones' corporations. The issue was clearly raised that the Colvin contract and the pledge of letters of credit was one of the main causes that induced the sale of the lease to Main-McKinney Building Company. As Main Realty Company had no operating capital, it was agreed from its organization that all obligations assumed by it under the lease, the yearly rental, the yearly taxes, and all other obligations, should be absorbed and paid by the joint enterprisers in proportion to their stockholdings, which was done. In execution of this part of the contract appellants,

together with their associates in the enterprise, indorsed one note for $2,500 and another for $14,710.11, the proceeds of which were used in discharging obligations of Main Realty Company. Under this statement the Main Realty Company was nothing more than a depositary of the title to the lease for the joint enterprisers for their personal exploitation, upon an original investment, not of $12,500, the capital stock of Main Realty Company, but of $150,000, plus the amount represented by the two notes, one for $2,500 and the other for $14,710.11. All these several sums were invested by the joint enterprisers in the lease and its exploitation as part of the original contract under which it was purchased. The letters of credit, the funds raised by the two notes, were put at hazard in the venture equally and under the same agreement as was the capital stock of Main Realty Company.

In denying this proposition appellees assert that the letters of credit and the amount of the two notes cannot be considered in dividing the profits of the venture because these sums were repaid to the joint enterprisers without the loss of one cent; that appellants did not even have to pay interest and carrying charges on the note executed by them to their bank for the letter of credit in the sum of $70,800. In this proposition they overlooked the fact that the amount of the capital stock of Main Realty Company was also returned to the joint enterprisers and the proposition that the joint enterprisers submitted their entire investment, letters of credit, notes, and borrowed money to the hazards of this venture under the same original agreement by which the lease was taken upon the Houston property. It is clear —at least the issue was raised—that the letters of credit and the proceeds of the notes were as much a part of the capital of the joint venture as was the capital stock of Main Realty Company and that the letters of credit furnished by appellants and the proceeds of the notes endorsed by them contributed to the success of the joint venture on equal terms and under the same agreement as did the capital stock of Main Realty Company.

Appellants suggest that the court should have submitted to the jury the issue of estoppel and ratification by the stockholders and board of directors of the act of Santikos in taking the $4,200, and also the adjustment by arbitration of this lawsuit and of all contentions connected therewith. We have examined the statement of facts carefully on these issues and are not prepared to say, as the record is now before us, that they were raised as fact issues for the jury in so far as they relate to Alamo Amusement Company, and these issues were not specially pleaded as against any of the stockhold-

ers of the Alamo Amusement Company. The other propositions discussed by appellants need not arise upon another trial.

For the reasons stated the judgment of the lower court is reversed, and the cause remanded for a new trial.