**EBBERTS et al. v. McLEAN et al.**
**No. 2491.**

Court of Civil Appeals of Texas. Beaumont.
Feb. 8, 1934.

Rehearing Denied March 7, 1934.

L. J. Freeman, of Beeville, J. D. Dodson, of San Antonio, Benckenstein & Carrington, of Beaumont, and J. R. Dougherty, of Beeville, for appellants.

W. D. Gordon, E. E. Easterling and Orgain, Carroll & Bell, all of Beaumont, for appellees.

WALKER, Chief Justice.

This case was argued to us as a "ten million dollar lawsuit." The appeal is from an order sustaining a general demurrer to appellants' second amended original petition, filed in the trial court on February 24, 1933. The original petition was filed in district court of Jefferson county on the 22d day of December, 1932. The appellants, M. J. Ebberts, J. J. Nathan, Frank C. Weber, W. B. Flynn, C. W. Howth, Jno. I. Pittman, H. W. Gilbert, Mrs. Likens Ogden, a feme sole, for herself and as independent executrix of the estate of Likens P. Ogden deceased, Miss Nellie McNamara and Mr. and Mrs. Irwin Fridge, were the plaintiffs below. Many defendants were named in the trial petition, but affirmative relief was sought against only Marrs McLean and Yount-Lee Oil Company, holding under McLean. The trial petition with its exhibits consumes ninety-five pages of the transcript. We think the following summary of the material facts of the petition sufficiently reflects the nature of appellants' cause of action:

On the 4th day of January, 1918, McLean acquired an oil and mineral lease from Elizabeth K. Cade and others upon certain land adjacent to High Island (a hill) in Galveston county. The land surrounding High Island and adjacent thereto was believed to be oil land, and prior to January 4, 1918, McLean, with the aid of appellants and certain of the

defendants, had made two unsuccessful efforts to bring in an oil field. The facts of these two first efforts will be subsequently stated. The first and second conditions of the lease of January 4, 1918, were as follows:

"First: The said Marrs McLean obligates himself to begin operations for the drilling of a well for oil or gas on the land herein leased within ninety days from January 1st, 1918, or forfeit all rights granted, herein save and except that the said Marrs McLean will have the right to prevent said forfeiture by paying to the lessors herein the sum of Five Hundred Dollars on or before the expiration of the said ninety day period, and the payment of said sum shall extend the time within which to start drilling operation an additional ninety days. Failure on the part of the lessor to start drilling within ninety day extension period will wholly terminate this lease. The payment of the said $500.00 if the same should be elected to be paid by the lessee, is to be made to L. P. Landis or deposited to his credit in the Gulf National Bank at Beaumont for the benefit of all the lessors herein.

"Second: If the lessee, his heirs or assigns, begin the operations for drilling of a well on the said premises but shall fail to prosecute such operations with reasonable diligence, then this lease shall become void & of no effect. After the lessee shall have begun such operations of drilling a well, then he shall have the right to make as many attempts to find oil or gas as he pleases and to continue the exercise of such rights as long as he pleases, provided, however, that such attempts are successive in the sense that until oil or gas are found in paying quantities, not more than ninety days shall elapse between the abandonment of one well and the beginning of a new one. If the lessee avails himself of the rights herein granted and begins operations for drilling said well, then the lessors shall have the right to access to the well and be entitled to all information in regard thereto and also to a log of the well."

After acquiring that lease, McLean entered into the following contract with appellants and certain of the defendants:

"Well No. 3. Marrs McLean is the owner of oil and mineral leases on the following described tracts of land at High Island, aggregating a total of (642) Six Hundred and forty-two acres, to-wit: [Here follows description of leased premises.]

"Marrs McLean proposes to organize a company with a capital stock of Fifteen Thousand Dollars divided into shares of Fifty Dollars each. The money thus raised to be used in development work on said leases. McLean agrees to assign the above described leases to the proposed company for one-fifth interest in the proposed corporation's stock or any increase thereof, the said interest being full compensation to McLean for the leases, promotion of the corporation and looking after the development work. McLean agrees that in event he starts development work prior to the incorporation of the said company he will conduct the work in his own name without any liability to the subscribers hereto.

"As soon as all stock in the proposed corporation is subscribed for, a meeting will be called for all subscribers hereto for the purpose of perfecting the organization of the company. All subscriptions are to be paid to J. T. Shelby, who will act as treasurer prior to incorporation. One-half of subscription to be paid at time of signing this subscription list and the balance within thirty days thereafter.

"We, the undersigned, subscribe for the amount set opposite our names with the understanding that the amount is to be the full amount of our liability.

| | |
|---|---|
| Marrs McLean (cash subscription) | $3,000.00 |
| *M. J. Ebberts | 500.00 |
| W. D. Gordon | 750.00 |
| Shareholders in No. 2 Well | 2,500.00 |
| *L. P. Ogden | 250.00 |
| *W. B. Flynn | 600.00 |
| J. T. Shelby | 100.00 |
| *F. C. Weber | 100.00 |
| L. M. Josey and B. A. Steinhagen | 400.00 |
| Jno. I. Pittman | 100.00 |
| N. McNamara | 100.00 |
| W. E. Orgain and Chas. T. Butler | 100.00 |
| P. O. Dowlen | 150.00 |
| E. A. Addy | 500.00 |
| W. D. Gordon (additional) | 250.00 |
| *Harvey Gilbert | 250.00" |

An inspection of this subscription list shows that the subscribers marked with a star are appellants, and the further fact is that the other subscribers were named as defendants. Each of the subscribers paid the amount of his subscription. Appellants C. W. Howth and J. J. Nathan were subscribers in one of the other oil ventures made by McLean in that territory, and, because a small amount of salvage from the second adventure was used in this third adventure, they, with the other subscribers to the second adventure, were carried for an interest of $2,500 in the third adventure as "Shareholders in No. 2

Well." Under this contract McLean drilled a third well on his leases which resulted in a "dry hole." All the available capital of this joint adventure was used in drilling this third well, but a small amount of pipe and other oil machinery was salvaged after the well was abandoned and was held by McLean for those interested with him in this third adventure. The corporation provided for in the subscription agreement was never organized, nor was any request made by any of the subscribers that it be organized. McLean never at any time made any conveyance of his leases, as was contemplated by the subscription agreement, but retained in his own name the title thereto. After his third failure, McLean took a fourth lease dated July 27, 1918, designated by appellants as a "top lease," on certain tracts of land adjacent to High Island, including the land covered by the subscription agreement above referred to, and also certain other land, upon the same general conditions as the leases covered by the subscription agreement, but also containing the following additional covenants:

"Eighth: It is further agreed that this lease is not to become of full force and effect until the lease made by the parties hereto on January 4th, 1918, and recorded in the Deed Records of Galveston County in Book 308, pages 574 to 578 inclusive is forfeited.

"If the lessee succeeds in developing oil in paying quantities or continues development work on the said lease of January 4th, 1918, this present lease is not to be of any effect or force whatever, as is the understanding of the parties hereto that this lease is to be a substitution of said lease executed on January 4th, 1918, at the election of the lessee and the execution of this lease prior to the forfeiture of the said lease of January 4th, 1918, is done solely for the purpose of saving time in the event the lessee should elect to abandon said lease of January 4th, 1918, and do development work on the westward side of the Hill at High Island on the land embraced in the present lease."

On the 17th day of November, 1918, McLean wrote the following letter to the stockholders in his third well:

"Beaumont, Texas, Nov. 17, 1918.
"To the Shareholders in McLean's No. 3 Well at High Island,

"Gentlemen: The following is a statement of the financial situation in reference to well drilled at High Island. All bills have been paid. There is no cash fund.

"After the increase of capital stock, the list of subscribers in paid up subscription is as follows:

| | |
|---|---:|
| Shareholders in McLean No. 2 Well | $2,500.00 |
| P. O. Dowlen | 50.00 |
| John I. Pittman | 150.00 |
| W. D. Gordon | 1,175.00 |
| W. B. Flynn | 800.00 |
| Orgain & Butler | 150.00 |
| Frank Weber | 150.00 |
| J. S. McNamara | 150.00 |
| Associated Oil Co | 500.00 |
| Likens Ogden | 250.00 |
| M. J. Ebberts | 750.00 |
| B. A. Steinhagen | 265.00 |
| L. M. Josey | 300.00 |
| H. W. Gilbert | 250.00 |
| J. T. Shelby | 100.00 |
| Marrs McLean (cash) | 6,775.00 |
| | $14,415.00 |
| Marrs McLean (Bonus stock 20%) | 3,585.00 |
| Capital Stock | $18,000.00 |

"Statement has been made in this form so that subscribers may keep this as evidence of their interest.
　　　　　　"J. T. Shelby. [Signed.]
　　　　　　"Marrs McLean. [Signed.]

"Salvage amount to 500 ft. of 10″ casing, 1520 ft. of 6″ casing, 1600 ft. of 4″ drill stem, 2500 ft. of 2″ water lines, 350 ft. of 2½″ pipe and a small gas engine and fuel tank. This if sold at the well to second hand dealers would bring about $2,500.00 or $3,000.00.

"I am preparing to drill a fourth well at High Island on about 400 acres of leases, and have made proposition to most of the shareholders, which was acceptable to them, to use this pipe for my next well, and allow the stockholders in No. 3 well a stock interest in the No. 4 well of $6,000.00 which makes salvage amount to 33⅓% on capital stock of $18,000.00. I am allowing shareholders in No. 3 well approximately the full value that it would cost the shareholders in No. 4 well to duplicate this material.

"The capitalization against the next well will be $17,000.00.

"I appreciate the support you have given me in this work. I have done my best to give every one as good a run as possible for their money, and will continue to do so. So far I have no oil to show, but I believe I eventually will, as possible locations to test out High Island are now so limited that a bad guesser now stands a chance of picking right.
　　　　　　　"Marrs McLean. [Signed.]"

McLean undertook the drilling of a fourth well upon the land covered by the lease of January 4, 1918, but abandoned it without discovering oil. Appellants were not given an opportunity to participate in the cost of drilling the fourth well, nor did they ask that privilege. On the 19th of December, 1918, McLean entered into a contract with the Sun Oil Company, whereby he sold it all the material and equipment owned by the third well venture and all the leases covered by the subscription contract under which the third well was drilled, together with all other leases covered by his lease of date the 27th of July, 1918. Under this contract McLean was reimbursed by the Sun Company for all expenses incurred by him on well No. 4. This contract was never placed of record. On March 3, 1919, McLean wrote the following letter to the shareholders in well No. 3:

"Beaumont, Texas, March 3rd, 1919.
"Marrs McLean
"Shareholders McLean No. 3 Well, High Island,

"Enclosed check for $3,630.09, which is for your interest in sale I made on pipe etc. amounting to $5,255.75. Of this amount $1,847.39 is for salvage on 6″ inch pipe, which is divided between those who stood an assessment to buy it. The price received amounted to 70% of list price of different size pipe.

"It was my intention to drill a fourth well and carry the shareholders of No. 3 in it, in lieu of a cash salvage, but was unable to go ahead on account of not having in sight sufficient support so I made a trade with the Sun Company in which they take over my leases. In my assignment to them I will reserve two ten acre tracts—one north and one south of the well for the benefit of the shareholders in No. 3 in proportion to their interest. The two ten acre tracts being in the Fitzsimmons Survey and being the east half of Blocks 25 and 32 and the South half of Blocks 10 and 11. The leases being held under the drilling of No. 3 well have been forfeited, except a 15 acre tract off of west end of Smith lease on S. W. side of hill and ten acres of the League lease on South side of hill. I am keeping rentals paid on these leases.

"Capital of No. 3 well is $18,000.00. Your interest is $12,059.00.
"Very truly yours,
"[Signed] Marrs McLean.

"Such as the foregoing has been mailed to each of stockholders showing their interest 3/4/1919."

Each shareholder received and cashed the check thus mailed him. In the Sun Company contract, entered into on December 19, 1918, McLean retained a $\frac{1}{24}$ excess or overriding royalty in the lands and leases conveyed and a reversionary estate in the land, in that he imposed upon the Sun Company the duty to reassign the lease to him in the event it elected to discontinue operations thereunder. The Sun Company required McLean to procure a ratification of the lease of July 27, 1918, signed by Elizabeth K. Cade et al. Pursuant to this requirement, on March 31, 1919, he secured the required lease from Elizabeth K. Cade et al. as lessors to himself as lessee, covering the same land incorporated in the January 4 and July 27, 1918, leases. This lease ratified, and was substituted for, the above leases, and contained the following provisions:

"To have and to hold unto the said Marrs McLean, and his successors and assigns under the terms and provisions as follows, to-wit:

"First: It is understood that the lessee, Marrs McLean, has commenced the drilling of a well for oil and gas on a part of the land herein leased, which was commenced in conformity with the terms of a lease dated July 27, 1918, and executed by all of the lessors herein, except by Mrs. Laurence Humphries Taylor in her capacity as guardian of Louise Humphries Taylor and Mary Robert Taylor, Minors, and the said McLean agrees to continue the operations on said well with reasonable diligence. The said lease of date January 4, 1918, which is recorded in Book 308, page 574, of the Deed Records of Galveston County, Texas, is hereby cancelled and this lease is substituted therefor; said lease of July 27, 1918, is also cancelled hereby and this lease substituted therefor, except that the transfer or transfers thereunder from Marrs McLean to C. A. Holt, Jr., and I. P. Landis, affecting about 200 acres of the land embraced herein and the re-transfer of about 30 of said 200 acres by said Holt and Landis to the said McLean are not cancelled, but are ratified."

On June 14, 1919, McLean assigned to the Sun Company the March 31, 1919, lease, as he was required to do under his contract with the Sun Company, save and except certain lands therein described, referred to in his stockholder letter of date March 3, 1919. After receiving these assignments from McLean, the Sun Company was diligent in discharging the conditions of the lease thus assigned to it, by drilling for oil as the lease required, until

on or about October 17, 1927, when it ceased development on the land, and, by reason of the reversionary estate retained by McLean, executed and delivered to him a reconveyance of the lease. On receiving this reconveyance, McLean continued operations upon the leased premises, and was finally successful in finding oil in paying quantities, and on March 18, 1931, executed and delivered an assignment of the lease of March 31, 1919, to appellee Yount-Lee Oil Company. Yount-Lee Oil Company immediately went into possession of the leased premises, and has been developing and producing oil therefrom ever since. Appellants further alleged that they did not know of the execution of the leases of the 27th of July, 1928, and the 31st of March, 1929, nor of the contract between McLean and Sun Oil Company, dated the 19th of December, 1918, and did not learn of these leases and contract until shortly before this suit was filed. Though McLean, by his letters to his stockholders above referred to, had advised appellants that he was unable to go ahead with the drilling of well No. 4 and that the leases held under the drilling of well No. 3 had been forfeited, it was further alleged that these statements were false but relied upon by appellants as true, but no facts in support of the falsity of these representations were alleged, except as stated above. From the beginning of the contractual relations between appellants and McLean, up to the time they discovered the existence of the leases of July 27, 1918, and March 1, 1919, appellants alleged that they had full confidence in his good faith and honesty; appellants were all residents of Jefferson county, Tex., as was also appellee McLean, while all development operations and the records of all the leases described in appellants' petition were in Galveston county. We quote as follows from appellants' brief: "Appellants alleged as facts that none of them had knowledge of McLean's fraud in taking the top leases of July 27, 1918 and March 31, 1919, his assignment of the same, and his repossession thereof; that there were no facts or circumstances in the possession of any of appellants which would arouse their suspicions or the suspicions of a reasonably prudent person; further that there existed a confidential and fiduciary relationship between them; and further, that McLean continuously misrepresented the true facts to them and thereby fraudulently concealed their cause of action and they had a right to rely upon such representations."

It was the theory of appellants' petition that they owned an equitable interest in all the leases covered by the subscription contract for the third well, and that McLean took the leases of the 27th of July, 1918, and of March 31, 1919, for them and his other subscribers to the third venture as their trustee, and held and exploited them for the benefit of all the subscribers to that contract; and, having thus pleaded a cause of action for breach of trust, that it was not barred by limitation.

### Opinion.

Appellants' petition was subject to the general demurrer. It is our judgment that they did not plead a cause of action for breach of trust, but, if in error in that conclusion, then their cause of action was barred by limitation long before this suit was filed on December 22, 1932. For the following reasons the petition did not state a cause of action:

First. Appellants concede that the subscription contract for drilling well No. 3 was merely a "joint adventure" between McLean and his subscribers, for the purpose of drilling "Well No. 3." This joint adventure related to a single transaction—that of drilling well No. 3—and, when that was finished, the joint adventure was concluded. 33 Cyc. 849, § 23. The failure of McLean to find oil in his third well ended this adventure and terminated the rights of appellants in his leases. 33 Cyc. 848, § 21.

We think the facts pleaded by appellants force the conclusion that the drilling of well No. 3 ended the third joint adventure, upon which they base their cause of action. The facts may be summarized as follows: (a) In the statement above, reference is made to the efforts of McLean and certain of the appellants and defendants below to exploit for oil the land adjacent to High Island, by drilling wells Nos. 1 and 2. The subscription agreements by which wells Nos. 1 and 2 were drilled were similar in their terms to the subscription for well No. 3, except as to the capital stock of the proposed corporations and the interest to be retained by McLean. Agreements Nos. 1 and 2 also provided for the organization of corporations in which the subscribers were to hold stock in proportion to their subscriptions, and that McLean should transfer his leases to these corporations. The first corporation was organized but not the second. In none of these adventures did McLean ever make a transfer of his leases to any one, nor was he asked by any of his subscribers to make such transfers. The failure to find oil in these first two wells was construed by all parties as terminating the

adventures and the rights of the subscribers thereto in McLean's leases. No fact is pleaded in connection with the third subscription agreement, giving it a different construction. (b) When the funds of the third venture were exhausted, appellants made no offer to continue as members of the venture, nor did they at any time make tender of any of the expenses to prosecute the drilling necessary to protect the McLean leases, as required by their conditions. As had been done by him in ventures Nos. 1 and 2, McLean rendered an accounting to the subscribers to his third venture, and, as he had done in the other ventures, proposed to carry them as subscribers to the fourth venture to the amount of the value of the salvage from the third venture. By his letter of November 11, 1918, McLean gave the third venture contract the same construction given by him and appellants and his other subscribers to the first and second venture contracts, that is, that they had no interest in his leases, as such, but only in the profits to be made from a fourth venture. This letter constitutes an affirmative statement that the old subscribers had no interest in his leases but only in the salvage. Appellants did not protest against this construction of their rights under the third venture contract until about the time they filed this suit in December, 1932. By his letter of March 3, 1919, McLean advised appellants that the fourth venture had been abandoned, and the salvage from the third venture sold, and with this letter he remitted to his subscribers for their respective interests in the salvage. (c) Under the three subscription agreements and the letter of November 11, 1918, the subscribers were to have an interest, not in the leases, but in a corporation, to be organized to hold the leases. No corporation was ever organized except under the first agreement. No transfer of any kind was made by McLean of his leases to any one for the benefit of his subscribers. All parties knew that all available funds of the adventure had been exhausted. It is unquestionably the law that, when the purposes of a joint adventure have been fully consummated, the joint venture ceases. 25 Tex. Jur. 159. Under the facts pleaded, we cannot escape the conclusion that appellants, as subscribers to the third contract, became joint adventurers with McLean and his other subscribers upon the mutual agreement of all parties that the venture should end, thereby terminating their rights in McLean's leases, in the event oil was not found in the third well. Whitman v. Bartlett, 156 Ala. 546, 46 So. 972; Green v. Hall (Tex. Com. App.) 228 S. W. 183; Robichaux v. Bordages (Tex. Civ. App.) 48 S.W.(2d) 698.

■ Second. We think it can be further said that the law construes the facts pleaded by appellants as an abandonment by them of the joint adventure, whatever may be the proper legal construction of their subscription agreement. Appellants knew that the McLean leases could be protected only by a continuing development—drilling well after well until oil was found—and that the failure to continue the prosecution of the required development would operate in a forfeiture of the leases, and that it would require large expenditures of money to continue future operations. They knew that they were not liable for any cost of development beyond their respective subscriptions, and that the drilling of well No. 3 had exhausted all available funds of the joint adventure, and that there were no funds of the adventure to prosecute further development for the protection of the leases. When the funds of the joint adventure were exhausted, no one would deny the proposition that appellants had the right to withdraw from the enterprise and that thereafter they would not be liable to any one to any extent for the costs of the subsequent operations. 34 C. J. 849. Facts could hardly be marshaled, evidencing more clearly an abandonment of a joint adventure, as a matter of law, than do the facts pleaded by appellants. In First Nat. Bank v. Rush, 210 S. W. 521, our Commission of Appeals held, with the approval of the Supreme Court:

"4. Under an executory contract for a joint adventure, where a member after agreeing to furnish the necessary money failed to do so, the other member might treat contract as abandoned.

"5. The mere failure of a partner to pay money into the partnership under a partnership agreement will not work a forfeiture of his interest and a dissolution of the partnership, but abandonment may be implied from acts and conduct of the parties inconsistent with an intention on their part to continue the contract, expecially in regard to contracts executory in their nature where little has been done toward their performance."

■ When the joint enterprise is abandoned by certain of the joint adventurers and subsequently prosecuted to success by one of them on his own account, as McLean did in this case, the law is that "he will not be required to answer to his former associates for any of the profits earned by him." 33 C. J. 849, §

■ Third. For another reason, appellants failed to plead a cause of action, in that they failed to plead a proper measure of damages, or facts upon which their damages could be calculated or determined. The theory of their case was that they had the right to participate in the profits made by McLean in the subsequent development of the High Island leases, in proportion to the amount of their subscriptions to well No. 3. The facts pleaded by them affirmatively denied that right. The leases in which they claimed an interest provided, as we have said above, for the drilling of wells one after the other until oil was discovered. After the abandonment of well No. 3, they pleaded that the Sun Oil Company and Marrs McLean protected these leases by continuing the oil development until 1931, until oil was found in paying quantities. Merely to illustrate this point the statement is made by McLean in his brief, which he says is supported by depositions on file herein in the lower court, that under its contract with him the Sun Oil Company spent $2,000,000 in an effort to find oil at High Island, and, after the leases had been reassigned to him by the Sun Oil Company, he expended an additional sum of $498,000 before oil was discovered. Appellants pleaded no facts from which the cost of developing the High Island oil field, after the abandonment of well No. 4, could be deduced, but, as we have stated, predicated their cause of action upon the expenditures for the development of well No. 3, with a prayer to the effect that McLean be reimbursed for the cost of this development from the profits of the venture, and that the net profits after this accounting with McLean be divided in proportion to the subscription contract for well No. 3. This was not the legal measure of their rights, if any they had. Under the facts, if appellants pleaded a cause of action, it was merely to share in the profits of the joint adventure, to be derived from the oil produced from the leases, in proportion to the cost of protecting them and discovering oil. This cost represented not only the amount of the third subscription contract, but also the subsequent good faith expenditures of the Sun Oil Company and McLean. The facts of this proposition are similar, if not on all fours, with the facts in Marosis v. Alamo Amusement Co. (Tex. Civ. App.) 60 S.W.(2d) 876. That was a suit for division of the profits of a joint adventure. The sixth syllabus, reading as follows, is to the effect that the profits were to be divided on the basis of the capital investment in the adventure: "Court erred in dividing profits of corporation, in stock of which

two incorporators invested money of another corporation, on basis of their stockholdings in former company, where letters of credit furnished by all incorporators and proceeds of notes indorsed by them were also put at hazard."

Our conclusion that the failure of the third well, as a matter of law, terminated the venture and all rights of appellants in McLean's leases, or, in the alternative, that the facts, as a matter of law, constituted an abandonment by appellants of the enterprise, clearly distinguishes this case from the line of authorities cited by appellants to sustain their propositions: (a) That one partner, secretly obtaining the renewal of a partnership lease in his own name, will be held a trustee for the partnership, Mitchell v. Reed, 61 N. Y. 123, 19 Am. Rep. 252; Meinhard v. Salmon, 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1; Maas v. Lonstrof (C. C. A.) 194 F. 577; (b) all members of a joint enterprise must be loyal to its interests, Delmonico v. Roudebush (C. C.) 5 F. 165; Lind v. Webber, 36 Nev. 623, 134 P. 461, 135 P. 139, 141 P. 458, 50 L. R. A. (N. S.) 1046, Ann. Cas. 1916A, 1202; Johnson v. Ironside, 249 Mich. 35, 227 N. W. 732; Wyoming-Indiana Oil & Gas Co. v. Weston, 43 Wyo. 526, 7 P.(2d) 206, 80 A. L. R. 1037. While these cases fully support the propositions upon which they are cited, they do not sustain appellants' petition against the general demurrer; and that for the reason that the very contract upon which they entered into the joint enterprise precluded them from claiming an interest in McLean's right of renewal, in the event the third well proved a failure. If wrong in that conclusion, as stated above, the facts pleaded by appellant constitute, as a matter of law, an abandonment by them of the joint enterprise.

■ But, if appellants had any cause of action, it was long barred by limitation before this suit was filed. The authorities support their proposition that a cause of action for fraud is barred, as a matter of law, only when it appears from the facts pleaded that certain facts or circumstances came to the notice of the plaintiff sufficient to cause a reasonably prudent man to suspicion that a fraud had been perpetrated upon him and to cause him to make an investigation to determine the status of his rights. Al Parker Securities Co. v. Owen (Tex. Com. App. Sec. B. 1928) 1 S. W.(2d) 271; American Nat. Bank of Macon v. Fidelity Deposit Co. of Maryland, 131 Ga. 854, 63 S. E. 622, 21 L. R. A. (N. S.) 962; Carver v. Moore (Tex. Civ. App. 1925) 275 S. W. 90; Dean v. Dean (Tex. Civ. App. 1919) 214 S. W.

505; Sherwood v. South (Tex. Civ. App. 1930) 29 S.W.(2d) 805, writ refused; 20 Tex. Jur. (§ 76) 114.

■ The facts of this case were sufficient, as a matter of law, to require appellants to investigate the extent of their rights, if any they had. They were joint adventurers with McLean for the purpose of drilling one well. They were not obligated to assume any liability for any further development, and they knew that the leases in which they now claim an interest required further development in order to protect the title of the lessee. The corporation in which they were to participate to the extent of their respective subscriptions was not organized, and no request was made by them that it be organized, and McLean had made no transfer of the leases but continued holding the title in his own name and for his own use. McLean had notified them that their interest in the joint adventure had been liquidated, and they received from him and appropriated their respective interests in the salvage. He also notified them that they no longer had any interest in his leases except in the small tracts specially mentioned in his letter of March 3, 1919. He also told them that he had assigned his leases to the Sun Oil Company. They knew of the activities of the Sun Oil Company by which it was keeping the leases in full force and effect, and that without any obligation, voluntary or otherwise, on their part. True, they pleaded they did not know of the lease of July 27, 1918, nor of the lease of March 3, 1919, nor of the terms of the contract between Sun Oil Company and McLean. But they knew that McLean no longer recognized them as having any interest in his enterprise, and the subsequent activities conducted by him and Sun Oil Company were sufficient to put appellants upon inquiry. True, they pleaded they did not know of the terms of the contract between McLean and Sun Oil Company. This contract constituted an utter repudiation of any interest appellants could have had, and based the operating rights of Sun Oil Com-

pany and McLean upon the leases of July 27, 1918, and its recognition by the subsequent lease of March 31, 1919. The Sun Oil Company was in possession of the leased premises, in satisfactory discharge of the lease obligations. Certainly the activities of the Sun Oil Company during all the years of its development and the subsequent activities of McLean before oil was found in paying quantities were sufficient to require appellants to investigate under what claim of right this work was being done. The least investigation would have disclosed every fact upon which appellants rely to toll the statutes of limitation.

■■ Appellants seek to avoid the effect of the limitation statutes on the proposition that McLean held for them as an express trustee and had never repudiated his trust. There is no merit in this contention. If a trust relation existed, McLean was merely a constructive trustee, or, at most, the facts raised the issue of resulting trust. This follows because he never agreed to take the leases in issue for appellants. He had contracted to transfer the lease of January 4, 1918, to a corporation in which appellants were to be shareholders, but the corporation was not organized, and, of course, the transfer was not made. The facts necessarily exclude an express trust. Constructive and resulting trusts are within the operation of the statutes of limitation. Hightower v. Hester (Tex. App.) 15 S. W. 415; Kennedy v. Baker, 59 Tex. 150; Tinnen v. Mebane, 10 Tex. 252, 60 Am. Dec. 205; Wingate v. Wingate, 11 Tex. 432; Bremond v. McLean, 45 Tex. 19; Cooper v. Lee, 75 Tex. 122, 12 S. W. 483.

For the reasons stated, it is our conclusion that appellants' cause of action, if any they ever had, was barred by limitation when this suit was filed, thereby rendering the petition subject to the general demurrer.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.